MILLER & LUX, Inc., et al. v. CALIFORNIA PASTORAL & AGRICUL-
TURAL CO., Limited, et al.*

(Circuit Court of Appeals, Ninth Circuit.　June 8, 1908.)

No. 1,508.

WATERS AND WATER COURSES—CONTRACT BETWEEN APPROPRIATORS OF WATER
　FROM STREAM—CONSTRUCTION.
　　A contract and supplemental contract between parties severally taking
　water from the San Joaquin river by means of canals construed, and the
　rights of the respective parties thereunder determined.
　　Gilbert, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the South-
ern District of California.

W. B. Treadwell and Frank H. Short, for appellants.

Charles Page, Edward J. McCutchen, and Chas. W. Willard, for
appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.　The true construction of a written contract
is the question for determination in this case.　It was entered into
August 17, 1898, between the San Joaquin & Kings River Canal &
Irrigation Company, a corporation, as party of the first part, the Cali-
fornia Pastoral & Agricultural Company, a corporation as party of
the second part, and Miller & Lux, a corporation, as party of the third
part.

Inasmuch as this contract refers to and makes a part of it a previous
contract of date August 11, 1871, between William S. Chapman, party
of the first part thereto, and Henry Miller and Charles Lux, parties
of the second part thereto, the provisions of that previous contract
enter into and bear upon the true meaning of that governing the
parties here, who are: (1) The successors in interest of William S.
Chapman, were complainants in the court below and are appellees
here, and, for convenience, are referred to by counsel and in this opin-
ion, as the pastoral company; (2) the successors in interest of Henry
Miller and Charles Lux, defendants and cross-complainants in the
court below and appellants here, and, for convenience, referred to as
Miller & Lux; and (3) the San Joaquin & Kings River Canal & Ir-
rigation Company, defendant and cross-complainant in the court be-
low and appellant here, and referred to by counsel, and by us, as the
canal company.

Certain waters of the San Joaquin river constitute the subject-mat-
ter of the suit, and, to the end that a better understanding of the con-
troversy may be had, we here insert a diagram found in one of the
briefs for the appellants, which the record shows to be a correct rep-
resentation of the premises with one exception, which is this: The
slough marked on the diagram "Lone Willow Slough" extends, as a
matter of fact, to its connection with the river at the point marked
upon the diagram "Headgate," so that the indication upon the diagram

*Rehearing denied October 26, 1908.

that the artificial Chowchilla Canal extends from the point marked thereon "White House Headgate" to the point on the river marked "Headgate" is erroneous. The diagram is as follows:

### T. 13 S. R. 15 E.

The contract of August 11, 1871, omitting such parts as are not here pertinent, is as follows:

"This agreement, made and entered into this 11th day of August, A. D. 1871, by and between William S. Chapman, party of the first part, and Henry Miller and Charles Lux, parties of the second part, all of the city and county of San Francisco, witnesseth:

"That said party of the first part, for and in consideration of the sum of one dollar to him in hand paid by the said parties of the second part, the receipt of which is hereby acknowledged before the signing and delivery of these presents, and the further consideration of the mutual promises herein contained and set forth to be done and performed by the parties hereto, does hereby covenant and agree to and with the said parties of the second part, and the said parties of the second part do hereby covenant and agree to and with said party of the first part, that they will jointly dig and construct a canal for irrigation through lands of said parties of the second part in the county of Fresno, and state of California, the said canal to commence at

a point where a slough now makes out from the north side of the San Joaquin river, near the center of the dividing line between sections twenty-four (24) and twenty-five (25) in township thirteen (13) south, range fifteen (15) east, from the Mount Diablo base and meridian, and thence running in a northerly direction to the north line of the most southern tier of sections in township twelve (12) south, range fifteen (15) east, from said base and meridian, which said canal is to be twenty-five (25) feet wide, and shall be so constructed as to carry one and one-half (1½) feet of water in depth, and it is further agreed that the slough above mentioned may be used as a part of said canal as far as shall be deemed advisable. * * * And it being further understood and agreed that said parties of the second part shall at their own expense construct and put in all side gates and other works which may be required for taking out water from the said canal within the distance above specified.

"And it is further understood and agreed that said parties of the second part and their assigns shall have the right at all times to draw from said canal, without charge, by side gates and ditches, and to use and dispose of one half of the water flowing therein, and said party of the first part and his assigns are to have the right at all times, also, without charge, to take at the northerly end of said canal, and to use and dispose of the remaining half of such water, and to carry the same further on by another canal or other canals, to be used as he may see fit, and further to enter upon and go on the land of said parties of the second part, with men and teams, over which said canal may pass, for the purpose of repairing the said canal, at any time, doing as little damage as is possible thereby. * * *

"And it is further covenanted and agreed that no work of any kind shall be done in the construction of said canal or anything connected therewith, which shall in any way injure the works of the San Joaquin & Kings River Canal Company.

"And it is further covenanted and agreed that should said parties of the second part find it necessary, in order to irrigate their lands or any portion thereof, to put a lock and dam or locks and dams in said canal, that they shall have the right to do so, not impairing the rights of said parties of the first part in so doing, nor impeding the flow of the water to be carried by said ditch, to which he is entitled, and, further, that a bridge shall be built over said canal, on the lands of the parties of the second part, at a point to be designated by them, at the joint expense of the parties hereto, each party paying one-half of said expense, and shall be kept in repair likewise at their joint expense.

"And it is further agreed that the said parties of the second part shall not be liable in damages to said party of the first part for any injury which shall be done to the banks of said canal by the cattle of said parties of the second part.

"In witness whereof the parties hereto have hereunto set their hands and seals the day and year first above written.    W. S. Chapman.   [Seal.]
                                                              "Miller & Lux.    [Seal.]"

Indorsed on the foregoing agreement of August 11, 1871, is the following:

"Know all men by these presents: That the parties of the first and second part respectively to the within agreement have jointly completed the canal provided therein to be built, and have jointly extended the same, from the terminus originally proposed, to the south line of township eleven (11) south, range fifteen (15) east from the Mount Diablo base and meridian; that a full and complete settlement and adjustment has been had between said parties of the first and second part of the amount contributed by each to the expense of constructing said canal; that each has now paid his share of the expense of such construction; and that the said canal, with its gates, sluices, embankments, and all the privileges and appurtenances thereto belonging or in any wise appertaining, is now owned in common by them from its commencement to said township line—that is to say, one undivided half by said party of the first part, and one undivided half by said parties of the second part. The expense of keeping in repair the canal so owned in common shall be equally borne; one-half by the said party of the first part, and one-half by said party of the sec-

ond part. Said party of the first part is to be at liberty to take out from said canal for use upon any land owned by him any portion of his half of the water in said canal at any point therein, not to interfere with any rights of said parties of the second part.

"In testimony whereof said parties of the first and second part have hereunto set their hands and seals this sixteenth day of January, A. D. 1872.

"W. S. Chapman. [Seal.]

"Miller & Lux. [Seal.]

"By Henry Miller."

Since the earlier contract is expressly made a part of the later one, it is manifest that the two must be read and considered together, and that in order to ascertain the true meaning of the parties we must first get a clear understanding of the first, and then bear in mind the purpose of the second.

Looking, then, at the agreement of August 11, 1871, we find therein an express recognition by all parties thereto (Chapman and Miller & Lux) of whatever rights the canal company had. Those rights were in the contract of August 11, 1871, wholly undefined; but, such as they were, they were recognized and acknowledged by Chapman and Miller & Lux in and by this clause in their agreement:

"And it is further covenanted and agreed that no work of any kind shall be done in the construction of said canal [the canal provided for by the agreement of August 11, 1871] or anything connected therewith, which shall in any way injure the works of the San Joaquin & Kings River Canal Company."

Having thus acknowledged the paramount, although indefinite and uncertain, rights of the canal company, Chapman and Miller & Lux proceeded, in and by the instrument of August 11, 1871, to agree to jointly dig and construct through the lands of Miller & Lux a canal for irrigation, from the point where the Lone Willow Slough makes out from the San Joaquin river and near the center of the dividing line between sections 24 and 25 (indicated on the diagram), and thence running in a northerly direction to the north line of the most southern tier of sections in township 12 south, range 15 east, from the Mount Diablo base and meridian; the canal to be 25 feet wide and to be so constructed as to carry a depth of 1½ feet of water. The agreement further expressly provided for the use of the slough as a part of the canal as far as should be deemed advisable by the respective parties thereto, and the case shows that they did deem it advisable to use and adopt the slough as a part of the canal from the point where it leaves the river down to the point marked "White House Headgate," where the artificial part of the canal constructed by Chapman, on the one part, and Miller & Lux, on the other part, at their joint and equal cost, commences. The agreement of August 11, 1871, contains nothing whatever to indicate the quantity of water the respective parties contemplated diverting and appropriating thereby from the river. Indeed, in that respect, the provisions are about as uncertain and indefinite as that in respect to the acknowledgment of the paramount rights of the San Joaquin & Kings River Canal Company. But the agreement of August 11, 1871, does expressly provide that Miller & Lux shall have the right to construct and put in at their own expense all side gates and other works they may require for taking out water from the joint canal at any place between

163 F.—30

the point where the slough makes' out from the river, to the north line of the most southerly tier of sections in township 12 south, range 15' east, Mount Diablo base and meridian, and that by means of such side gates Miller & Lux, and their assigns, should have the right to draw from such joint canal, without charge, and use and dispose of, one half of the water flowing therein, and that Chapman, and his assigns, should have the right, also without charge, to take out at the northerly end of said joint canal, and to use and dispose of, the remaining half of such water; "and to carry the same further on by another' canal or other canals, to be used as he may see fit, and, further, to enter upon and go on the land of said parties of the second part, with men and teams, over which said canal may pass, for the purpose of repairing the said canal, at any time, doing as little damage as is possible thereby."

These provisions of the contract of August 11, 1871, are too plain to admit of controversy concerning them. They show, among other things, that Miller & Lux, and their assigns, were entitled thereby to tap the joint canal, by side gates put in at their own expense, at any place between the point where the slough made out from the river, and the north line of the most southern tier of sections in township 12 south, range 15 east, of the base and meridian mentioned, and to take from the canal, for their use and disposal, one half of the water flowing therein, whatever the quantity should be, with the right on the part of Chapman, and his assigns, to take at the north end of the canal, the remaining half of such water, and use and dispose of the same, with the additional right in Chapman, and his assigns, to extend such use by the construction of other canals in the lands of Miller & Lux.

Since the sole purpose of appropriating and diverting water for irrigation is the beneficial use of it upon land, it is manifest that convenient places for such diversion are of great, and often (depending upon the location of the land upon which the water is to be used) of controlling, importance. The places designated in the agreement of 1871 for the taking, by the respective parties thereto and their respective assigns, from the joint canal, of their respective moities of the water flowing therein, were therefore of the gist of the agreement.

The case shows that, in time, disputes arose concerning the waters in question, which resulted in the agreement of August 17, 1898, which latter agreement recites not, as we understand, what "must be taken to be the construction which had been placed on the contract of 1871 by the parties thereto," but, on the contrary, expressly recites that "differences have arisen between the parties hereto as to the rights of the said parties of the first (San Joaquin & Kings River Canal & Irrigation Company), second (The Pastoral Company), and third (Miller & Lux) parts hereto, to take water from the said San Joaquin river, and also as to the amount of water they are each entitled to take and receive from the said river, and as to their priorities in such water," and that it is entered into "for the purpose of settling and adjusting said differences as between the parties hereto." This latter agreement further expressly recites that "Miller & Lux

are the owners of and entitled to take and receive all the water now flowing or that may hereafter flow in the said slough through which said Chowchilla Canal now takes and receives its water, after the full amount of water which said Chowchilla Canal is entitled to receive through such slough is supplied to and received by and into its said canal, at the Headgate and Weir hereinafter referred to," and that "the party of the first part hereto, the San Joaquin & Kings River Canal & Irrigation Company, is the owner of canals which are taking water from the said San Joaquin river, and are entitled to take and receive water from said river into said canals." After making these express recitals, the parties to the contract of August 17, 1898, proceeded to provide and agree, among other things:

"(1) That said party of the first part has the prior right to divert from the San Joaquin river, at all times, sufficient water so that its canal shall have and receive seven hundred and seventy-five (775) cubic feet of water per second, measured at a point at its main canal immediately above the head of the branch of said canal which is known as the Poso Canal, and where said main canal passes through the northwest quarter (N. W. 1/4) of section thirty-three (33), township twelve (12) south of range fourteen (14) east, such measurement to be made by means of a gauge placed in said canal or by means of other proper measuring device. But it is understood and agreed that in the event said party of the first part shall at any time take and divert any of such seven hundred and seventy-five (775) feet of water to which said party of the first part has the first and prior right into its new canal, which is constructed so that it can take water from the main canal of the said party of the first part hereto, at a point above said point of measurement, then and in that event the water so taken into said new canal shall be measured, and said party of the first part shall in such case receive at the point of measurement hereinabove specified seven hundred and seventy-five feet of water per second, less the amount so diverted and taken into said new canal; that is to say, the amount of water so diverted and taken into such new canal shall be deducted from the seven hundred and seventy-five (775) feet of water to which said party of the first part has, under the terms of this agreement, the first and prior right.

"(2) That whenever the canal of said party of the first part is supplied with seven hundred and seventy-five (775) cubic feet of water per second at the point of measurement hereinbefore referred to. then, so long as that quantity is so supplied thereto, the parties of the second and third parts, as the owners of said Chowchilla Canal above referred to, shall have the right jointly to divert from said San Joaquin river, through said slough, sufficient water so that said Chowchilla Canal shall have and receive into its said canal, at the present Headgate or Weir in said canal and in the slough hereinabove referred to where it passes through the southwest quarter (S. W. 1/4) of section fourteen (14), township thirteen (13) south of range fifteen (15) east, one hundred and twenty (120) cubic feet of water per second, provided there is sufficient water flowing in said San Joaquin river to supply the said party of the first part hereto its full seven hundred and seventy-five (775) cubic feet of water, and also supply or furnish said Chowchilla Canal the maximum amount of water it is entitled to take and receive through said slough and through said gate, to wit, one hundred and twenty (120) cubic feet of water per second. In the event that there be not sufficient water flowing in said San Joaquin river to supply to said party of the first part its full seven hundred and seventy-five (775) cubic feet of water, and supply to the said Chowchilla Canal one hundred and twenty (120) cubic feet of water, then said Chowchilla Canal shall be entitled to take and receive from said river and from said slough and through said gate only the amount of water flowing in said river after the full seven hundred and seventy-five (775) cubic feet of water per second is supplied to said party of the first part at the point of measurement hereinbefore specified.

"(3) After the amount of water which the said party of the second part shall be entitled to take and receive into its said canal at its said Headgate or Weir is received by it, the balance of the water running in said slough above the

said Headgate, if any, shall belong to the said party of the third part hereto. But it is understood that this agreement neither fixes nor limits any rights of Miller & Lux, the party of the third part hereto, to the water flowing in said San Joaquin river, after the diversion therefrom of said quantities of seven hundred and seventy-five (775) feet and one hundred and twenty (120 feet herein provided for.

"(4) When the water in said San Joaquin river is at such low stage that said party of the second part is not, under this agreement, entitled to receive into its said canal sufficient water out of said one hundred and twenty (120) feet to supply the party of the second part in said canal with stock water, then and in that event the said party of the second part shall be entitled to receive from the water flowing in the said San Joaquin river, and belonging to the said party of the first part hereto, sufficient water for such stock purposes, provided there is sufficient water flowing in said San Joaquin river and in the canals of the said party of the first part to supply all of the parties having a prior right to demand and receive water from the canals of the said party of the first part, the San Joaquin & Kings River Canal & Irrigation Company, and to also supply such stock water to the party of the second part, such stock water so furnished to said party of the second part hereto by said party of the first part, to be turned into the canal of said party of the second part by the superintendent of the party of the first part, and to be paid for at the rates established for water sold by said party of the first part.

"(5) The agreement of said April 11, 1871, hereinbefore referred to, and to which this is supplemental, shall remain in full force and effect, except in so far as modified by this supplemental agreement; provided that the water at any time flowing in said Chowchilla Canal shall be equally divided between the parties of the second and third parts by actual measurement made at the point where said party of the third part is, at that time, diverting water from said canal. If the said party of the third part desires to divert water at more than one point on said canal at the same time, then such measurement shall be made at each of such points, so that said party of the third part shall receive at the second or any subsequent point only such proportion of the water then flowing at such point as, when added to the proportion of the water diverted by it at prior points, shall equal one-half."

It will be at once seen that there is much repetition and confusion in the supplemental contract of August 17, 1898, but we think it not difficult to discover therefrom the real meaning and intent of the respective parties thereto. First and foremost is the fact that the agreement of August 17, 1898, is supplemental to that of August 11, 1871, and that the latter, it is therein expressly declared, "shall remain in full force and effect, except in so far as modified by this supplemental agreement; provided that the water at any time flowing in said Chowchilla Canal shall be equally divided between the parties of the second and third parts by actual measurement made at the point where said party of the third part is, at that time, diverting water from said canal. If the said party of the third part desires to divert water at more than one point on said canal at the same time, then such measurement shall be made at each of such points, so that said party of the third part shall receive at the second or any subsequent point only such proportion of the water then flowing at such point as, when added to the proportion of the water diverted by it at prior points, shall equal one-half."

Next, it is to be observed that all parties to the supplemental agreement expressly declare, in more than one place, that the canal company has the prior right to 775 cubic feet per second of the water of the river, after which the pastoral company and Miller & Lux are

jointly entitled to take, when there is so much left in the river, 120 cubic feet of the water through and by means of their jointly constructed and owned Chowchilla Canal. In two places in the supplemental agreement, recognition is made of rights of Miller & Lux in and to such water as may flow in the river, and in the slough, after the 775 cubic feet have been taken by the canal company, and the 120 cubic feet by the pastoral company and Miller & Lux jointly. In respect to such excess of water flowing in the river, the provision is:

"But it is understood that this agreement neither fixes nor limits any rights of Miller & Lux, the party of the third part hereto, to the water flowing in said San Joaquin river, after the diversion therefrom of said quantities of seven hundred and seventy-five (775) feet and one hundred and twenty (120) feet herein provided for."

And in respect to such excess flowing in the slough, the provision is:

"After the amount of water which the said party of the second part shall be entitled to take and receive into its said canal at its said Headgate or Weir is received by it, the balance of the water running in said slough above the said Headgate, if any, shall belong to the said party of the third part hereto."

We do not overlook the conclusion reached by the learned judge of the court below that the words "the said party of the second part," of the last-quoted clause of the agreement, were inserted by clerical mistake for the words "the Chowchilla Canal." We cannot so regard them. The words, as they appear in the agreement, are in accord with what we conceive to be the true meaning and intent of the contract, taking it by its four corners. Precisely the same words, "the said party of the second part," were inserted in clause 4 of the agreement to secure to the pastoral company rights to water for its stock in the event of a shortage of water.

It is not contended that there is any express provision in the supplemental agreement taking away the express and valuable right the contract of 1871 conferred on Miller & Lux to take their just proportion of the waters in question from the Chowchilla Canal at any place or places they should desire, between the point where the slough makes out from the river to the north line of the southern tier of sections hereinbefore mentioned, and not only do we fail to discover from the language employed by the parties any indication of any such intent on their part, but we are unable to see how the denial of that right to Miller & Lux would result in any substantial benefit to the pastoral company, for surely no one will claim that Miller & Lux have not the right to take their half of the 120 cubic feet, or of whatever part of the water of the river may be left after the prior right of the San Joaquin & Kings River Canal Company is satisfied, from the Chowchilla Canal immediately after the water passes the White House Headgate and enters the artificial part of that canal. In what way the pastoral company can be any more injured by the taking by Miller & Lux of their proportion of the water immediately before it passes that gate it is difficult to see. However that may be, we are of the opinion, for the reasons stated, that reading the two agreements together, as they must be read and considered, Miller & Lux are entitled to take, at their own expense, their proportion of

the waters in question from the Chowchilla Canal at any place or places they may desire, between the point where the Lone Willow Slough makes out from the river to the north line of the most southern tier of sections in township 12 south, range 15 east, of the Mount Diablo base and meridian.

The case is remanded to the court below, with directions to modify the decree in accordance with the views above expressed; the appellant to recover the costs of this appeal, the costs of the trial in the court below, and those hereafter to be incurred in that court to be apportioned as the court below may deem equitable.

GILBERT, Circuit Judge (dissenting). In my opinion the appeal presents a plain case for affirmance of the decree of the court below. I am unable to find in the contract upon which the rights of the parties depend any ground whatever for the construction which is placed thereon by the majority of this court. To begin with the contract of 1871: That agreement provides for the construction of a canal, and stipulates that the slough may be used as a part of such canal so far as shall be deemed advisable. It further stipulates that Miller & Lux "shall have the right at all times to draw from said canal, without charge, by side gates and ditches, and to use and dispose of one half of the water flowing therein," and that Chapman, the party of the first part, is to have the right at all times, without charge, "to take at the northerly end of said canal, and to use and dispose of the remaining half of such water." Now, if there is any ambiguity in that agreement, it is as to the intention of the parties in the use of the word "canal," as it is found in that portion thereof just quoted. Did they mean the artificial portion of the canal, or did they intend to include under the term "canal" that portion of the slough which it had been agreed might be used as a part of the canal?

Whatever ambiguity there may have been in that provision of the contract, it was dispelled by the terms of the agreement of August 17, 1898. That agreement recites that the pastoral company, the party of the second part therein, has acquired the interest of Chapman, and recites what must be taken to be the construction which had been placed on the contract of 1871 by the parties thereto. It recites that Miller & Lux "are the owners of and entitled to take and receive of the water now flowing or that may hereafter flow in the said slough through which said Chowchilla Canal now takes and receives its water, after the full amount of water which said Chowchilla Canal is entitled to receive through such slough is supplied to and received by and into its said canal at the Headgate and Weir hereinafter referred to." What was the full amount of water which the canal was entitled to receive through the slough after which Miller & Lux should have the right so to divert water from the slough?

That question is answered by paragraph 2 of the contract, which provides that, after satisfaction of the right of the canal company to 775 cubic feet of water per second, the pastoral company and Miller & Lux shall have the right jointly to divert through the slough and into the canal by the White House Headgate 120 cubic feet of water

per second. Paragraph 3 proceeds to define the rights of the pastoral company and Miller & Lux as between themselves. It provides that:

"After the amount of water which the said party of the second part shall be entitled to take and receive into its said canal at its said Headgate or Weir is received by it, the balance of the water running in said slough above the said Headgate, if any, shall belong to the said party of the third part hereto."

The amount of water which the pastoral company, the party of the second part, was so entitled to "take and receive" into its canal at the White House Headgate was 120 cubic feet of water per second. This does not mean that it had the right to the use of that amount of water, but that it was entitled to the inflow of that quantity of the water into the canal. I think that the term "party of the second part," as used in paragraph 3, was used advisedly. It is used again in the same sense in paragraph 3, where it is provided that:

"When the water in the San Joaquin river is at such low stage that said party of the second part is not under this agreement entitled to receive into its said canal sufficient water out of said 120 feet to supply the party of the second part in said canal with stock water," etc.

The intention was, and it is clearly expressed, to concede to Miller & Lux the right to use and divert the surplus water in the slough, provided that such use should not interfere with the flow of 120 cubic feet per second into the canal. The right of the pastoral company to have 120 cubic feet flow into the canal, although it had the right to use only one-half thereof, was evidently considered a substantial right. The contract must have been made with reference to known conditions, and the construction of its terms is not to be affected by the consideration that Miller & Lux might have diverted its one-half of the water immediately after it had passed the White House Headgate.

Further evidence that the understanding of the parties was as above indicated is afforded by paragraph 5, which adopts the contract of April 11, 1871, with the proviso:

"That the water at any time flowing in said Chowchilla Canal shall be equally divided between the parties of the second and third parts by actual measurement made at the point where said party of the third part is at that time diverting water from said canal."

Obviously, the canal here referred to is the artificial portion of it below the White House Headgate, for by article 3 there is no provision for equal division of waters taken from the slough. On the contrary, it is therein stipulated that all water running in the slough over and above the 120 cubic feet per second, which is to enter the canal, shall belong to Miller & Lux.

If there were doubt about the meaning of the contract, we should find aid in ascertaining it from the construction which the parties placed thereon immediately after its execution. The evidence shows that, although Miller & Lux requested of the pastoral company the right to divide the water before it entered the White House Headgate, the right was denied, and that Miller & Lux never asserted such right under the terms of the contract until within a year prior to the commencement of the suit; but I agree with the court below that

"the contract is so clear and unambiguous in phraseology that it neither requires nor admits of any extraneous aids in its construction other than the physical conditions to which it relates."